David A. Ward
  New Jersey Bar No. 042381996
  dward@klugerhealey.com
**KLUGER HEALEY, LLC**
521 Newman Springs Road, Suite 23
Lincroft, NJ  07738
Telephone:  (973) 307-0800
Facsimile: (888) 635-1653

M. Scott Fuller
  Texas Bar No. 24036607
  Georgia Bar No. 100968
  sfuller@ghiplaw.com
Randall Garteiser
  Texas Bar No. 24038912
  California Bar No. 239829
  rgarteiser@ghiplaw.com
**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400

**ATTORNEYS FOR PLAINTIFF
BETEIRO, LLC**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **BETEIRO, LLC,**<br><br>Plaintiff<br><br>v.<br><br>**BETFAIR INTERACTIVE US LLC; TSG INTERACTIVE US SERVICES LTD. CORP.; and ODS TECHNOLOGIES LP,**<br><br>Defendants | **Case No. 1:21-cv-_____**<br><br>**JURY TRIAL DEMANDED** |

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    1

<u>**ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**</u>

Beteiro, LLC ("Plaintiff") hereby files this Original Complaint for Patent Infringement against Betfair Interactive US LLC; TSG Interactive US Services Ltd. Corp.; and ODS Technologies LP (collectively as "Defendants"), and alleges, upon information and belief, as follows:

<u>**THE PARTIES**</u>

1.   Plaintiff Beteiro, LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business at 600 S. Dixie Highway, Suite 605, West Palm Beach, Florida 33401.

2.   Upon information and belief, Defendants are each subsidiary entities collectively owned and controlled by their ultimate parent entity: Flutter Entertainment of Dublin, Ireland. On information and belief, Flutter Entertainment is a global sports betting, gaming, and entertainment provider and spreads its holdings among dozens of "Group Entities" around the World.

3.   On information and belief, Defendant Betfair Interactive US LLC is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 6701 Center Drive West, Los Angeles, California 90045. Further on information and belief, Defendant Betfair Interactive can be served through its registered agent in the State of New Jersey at: Corporation Service Company, Princeton South Corporate Center, Suite 160, 100 Charles Ewing Boulevard, Ewing, New Jersey 08628. Further on information and belief, Defendant Betfair Interactive is 95% owned by Flutter Entertainment. Further on information and belief, Defendant Betfair Interactive distributes, makes, uses, makes available, promotes, sells, offers to sell, and generates substantial revenues from products and services throughout the United States, including but not limited to the Internet domains registered and existing at: www.sportsbook.fanduel.com and its related State-Specific Sites (*e.g.,* New Jersey at www.nj.sportsbook.fanduel.com) and

Mobile Applications for Android and iOS.  Further on information and belief, and in accordance with the laws of the State of New Jersey (including, for example, New Jersey Sports Wagering Law, P.L. 2018 at Chapter 33), Defendant Betfair Interactive maintains both a physical business presence at the casinos with which it operates in the State of New Jersey (including, for example, Bally's Atlantic City and Meadowlands Racetrack), as well as physical equipment in the form of Internet servers, for providing the infringing services to residents of the State of New Jersey.

4.      On information and belief, Defendant TSG Interactive US Services Ltd. Corp. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business at: *c/o* The Stars Group, 1855 Griffin Road, Suite C450, Dania Beach, Florida 33004.  On information and belief, Defendant TSG Interactive US Services Ltd. Corp. can be served through its registered agent in the State of Florida at: Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301.  Further on information and belief, Defendant TSG Interactive is 100% owned by Flutter Entertainment.  Further on information and belief, Defendant TSG Interactive distributes, makes, uses, makes available, promotes, sells, offers to sell, and generates substantial revenues from products and services throughout the United States, including but not limited to the Internet domains registered and existing at: www.foxbet.com and its related State-Specific Sites (*e.g.,* New Jersey at www.nj.foxbet.com) and Mobile Applications for Android and iOS.  Further on information and belief, and in accordance with the laws of the State of New Jersey (including, for example, New Jersey Sports Wagering Law, P.L. 2018 at Chapter 33), Defendant TSG Interactive maintains both a physical business presence at the casinos with which it operates in the State of New Jersey (including, for example, Resorts Casino Hotel Atlantic City), as well as physical equipment in the form of Internet servers, for providing the infringing services to residents of the State of New Jersey.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          3

5.   On information and belief, Defendant ODS Technologies LP is a corporation organized and existing under the laws of the State of Delaware, and can be served through its registered agent in the State of Delaware at: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.  Further on information and belief, Defendant ODS Technologies is 95% owned by Flutter Entertainment.  Further on information and belief, Defendant ODS Technologies distributes, makes, uses, makes available, promotes, sells, offers to sell, and generates substantial revenues from products and services throughout the United States, including but not limited to the Internet domains registered and existing at: www.tvg.com and its related State-Specific Sites (*e.g.,* Pennsylvania at www.tvg/pennsylvania/ and New Jersey at www.4njbets.com) and Mobile Applications for Android and iOS.

## JURISDICTION AND VENUE

6.   This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338(a).

7.   This Court has personal jurisdiction over each Defendant.  On information and belief, each Defendant has continuous and systematic business contacts with the State of New Jersey.  On information and belief, each Defendant maintains physical offices, equipment, and employees in the State of New Jersey, and promotes itself as being licensed by the New Jersey Division of Gaming Enforcement.  Moreover, on information and belief, each Defendant generates substantial revenues in this District from its infringing Mobile Wagering Platform.

8.   On information and belief, each Defendant provides a plurality of gambling and event wagering services, including but not limited to providing and supporting its own branded Mobile Wagering Platform, which is comprised of hardware (including servers) and software (including source code).  On information and belief, such hardware and software are made, used, sold, offered for sale, and tested on the authority and under the direction of each Defendant.  Such branded Mobile

Wagering Platforms are directly accessible to users in the United States through the Internet domains and mobile applications of Defendants.

9.     Venue is proper in the District of New Jersey as to Defendant pursuant to at least 28 U.S.C. §§ 1391(b) and (c) and 1400(b). As noted above, each Defendant maintains a regular and established business presence in this District.

## **PATENTS-IN-SUIT**

10.     Plaintiff is the sole and exclusive owner, by assignment, of U.S. Patent Nos. 9,965,920 ("the '920 Patent"); 10,043,341 ("the '341 Patent"); 10,147,266 ("the '266 Patent"); and 10,255,755 ("the '755 Patent") (hereinafter collectively referred to as "the Beteiro Patents").

11.     By operation of law, the Beteiro Patents were originally issued and exclusively vested to the sole named inventor, Raymond Anthony Joao, as of the date of their respective issuances. *See* 35 U.S.C. § 261; *Schwendimann v. Arkwright Advanced Coating, Inc.,* 959 F.3d 1065, 1072 (Fed. Cir. 2020); *Suppes v. Katti,* 710 Fed. Appx. 883, 887 (Fed. Cir. 2017); *Taylor v. Taylor Made Plastics, Inc.,* 565 Fed. Appx. 888, 889 (Fed. Cir. 2014). Mr. Joao, in a written instrument dated March 6, 2012, and filed with the United States Patent and Trademark Office on May 7, 2015 at Reel 035604 and Frames 0126-0132, assigned all rights, title, and interest in the Beteiro Patents to GTJ Ventures, LLC. Thereafter, in a written instrument dated June 15, 2021, and filed with the United States Patent and Trademark Office on June 16, 2021 at Reel 056566 and Frames 0057-0060, GTJ Ventures assigned all rights, title, and interest in the Beteiro Patents to the Plaintiff, Beteiro, LLC. As such, Plaintiff Beteiro LLC has sole and exclusive standing to assert the Beteiro Patents and to bring these causes of action.

12.     The Beteiro Patents are valid, enforceable, and were duly issued in full compliance with Title 35 of the United States Code.

13.    The inventions described and claimed in the Beteiro Patents were invented individually and independently by Raymond Anthony Joao.

14.    Mr. Joao is a prolific inventor, with more than 80 issued United States Patents to his credit.  The Beteiro Patents represent substantial advancements in the gambling industry which were unconventional at the time of invention.  In fact, Mr. Joao is extremely knowledgeable in the field, having earned: (i) a Masters Degree in Sports Management from Columbia University (New York); and (ii) a Masters Degree in Global Sports Law from Instituto Superior de Derecho y Economia (Madrid, Spain).

15.    The Beteiro Patents each include numerous claims defining distinct inventions.

16.    The priority date of each of the Beteiro Patents is at least as early as May 31, 2002.  As of the priority date, the inventions as claimed were novel, non-obvious, unconventional, and non-routine.  Among other things, as of the priority date, the mobile gaming industry was essentially non-existent.  The first mobile gaming venture to launch internationally did not arise until 2003 in the United Kingdom, and that in the form of an elementary interactive instant win game.  *See, e.g., https://www.gamblingcommission.gov.uk/for-the-public/National-Lottery/About-the-National-Lottery.aspx.*  The concept of geolocation restrictions on such gaming platforms was not routine as of the priority date, and did not become so until many years thereafter.  Indeed, it was not until 2006 that the Nevada Gaming Control Board first cleared the way for wireless gambling in the United States.  Even at that time, the primary concern was over data security and identity controls, not geolocation   *See  https://www.nytimes.com/2006/05/03/technology/techspecial3/03gamble.html?smid=url-share.*

17.    As further evidence of the non-routine and unconventional nature of the solutions captured in the Beteiro Patents is the stated position of the now-leading geolocation provider in the United States

that: "Historically, the notion that you could indeed draw geographical boundaries on the internet would have been laughable; such was the weakness of the original technologies and the availability of cheap and easy methods to fake your location online."  *See https://www.geocomply.com/paspa-geolocation-compliance/.*  As such, the prevailing view as of the date of invention was to avoid global positioning as a means of legal compliance.

18.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '920 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '920 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular receiver for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS.  *See* Notice of Allowability, dated March 16, 2018.

19.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '341 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '341 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*.  Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          7

to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS. *See* Notice of Allowability, dated June 11, 2018.

20.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of the '266 Patent, Primary Examiner Jasson Yoo specifically and expressly considered whether the claims of the '266 Patent were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS. *See* Notice of Allowability, dated June 11, 2018.

21.     As further evidence of the stated non-routine aspects of the inventions, during prosecution of Application No. 16/939,030, Primary Examiner Jasson Yoo specifically and expressly considered whether the then-pending claims were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. Examiner Yoo affirmatively and expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims integrate the invention into a practical application by providing an improvement to a technical field; (ii) all claims provide an improvement to a technical field by allowing individuals to access gaming or gambling venues and/or activities without requiring them to be physically located at gaming or gambling venues

and/or activities; (iii) all claims provide individuals with information regarding the gaming or gambling venues so that bets can be placed from a remote location; (iv) all claims achieve the stated benefits by: (a) detecting a posting of information regarding a gaming activity, gambling activity or sporting event, and (b) generating a notification message regarding the gaming activity, gambling activity or sporting event; (v) in all claims a global position device is used to determine a position or location information of a communication device associated with the individual, and allowing or disallowing the activity request or bet based on the position or location information; as such, the claimed machine is required and imposes a meaningful limit on the scope of a claim and plays a significant part in permitting the claimed method to be performed; (vi) at the time the application was filed, the use of global positioning systems for various applications and providing a user a message if a posting was detected were not as well-known as today; in fact, and as indicated in the specification, prior art systems failed to provide a system that allows individuals access to particular gaming venues or gaming activities, and did not provide individuals certain information for enhancing their experience; and (vii) the claimed invention provides an improvement to online betting and therefore is integrated into a practical application. *See* Notice of Allowability, dated October 27, 2021.

22.     Plaintiff alleges infringement on the part of Defendant of the '920 Patent, the '341 Patent, the '266 Patent, and the '755 Patent (collectively as the "Asserted Patents").

23.     The '920 Patent relates generally to an apparatus, including a processor, specially programmed to detect a posting of information regarding a sporting event for which a bet can be placed, which detects the posting regarding the sporting event and generates a notification message containing information regarding the sporting event. The apparatus initiates a communication link with a first user communication device and transmits the notification message to the first user communication

device via the communication link; a receiver which receives a bet message, containing information regarding a bet on or regarding the sporting event, transmitted from the first user communication device or a second user communication device; and a transmitter. The apparatus or processor processes information for placing the bet and the transmitter transmits video information or audio information regarding, and obtained at, the sporting event to the first user communication device, the second user communication device, or a third user communication device. *See* Abstract, '920 Patent.

24.     The '341 Patent relates generally to an apparatus, including a computer including a processor which detects a posting of information regarding a gaming activity, gambling activity, or sporting event, and generates the notification message. The computer initiates a communication link with a first device and transmits the notification message to the first device. The computer receives a bet message transmitted from the first device or from a second device. The first device or second communication device includes a global positioning device and a display. The bet message contains information regarding a bet to be placed and information regarding the position or location of the first device or second device at a time of a transmission of the bet message. The computer determines if the bet is allowed or disallowed using position or location information of the first device or the second device. *See* Abstract, '341 Patent.

25.     The '266 Patent relates generally to an apparatus, including a computer. The computer detects a posting of information regarding a gaming activity, gambling activity, or sporting event, and generates a notification message. The computer initiates a communication link with, and transmits the notification message to, a first communication device, or the computer transmits the notification message as an electronic mail message which is received by a first communication device. The computer receives a bet message transmitted from the first communication device or

a second communication device. The first communication device or second communication device includes a global positioning device which determines a position or location of the first communication device or second communication device. The computer determines if the bet is allowed or disallowed using the position or location information. If allowed, the computer processes information for placing the bet. If disallowed, the computer processes information for disallowing the bet. *See* Abstract, '266 Patent.

26.  The '755 Patent relates generally to a method and apparatus, including: detecting, with a computer, a posting of information regarding a gaming activity, gambling activity, or sporting event; generating a notification message regarding the same; initiating a communication link with, and transmitting the notification message to, a first communication device as an electronic transmission, or transmitting the notification message as an electronic mail message; receiving a bet message transmitted from the first communication device or a second communication device, wherein the first communication device or the second communication device comprises a global positioning device which determines a position or location of the first communication device or second communication device, wherein the bet message contains information regarding a bet to be placed regarding the activity or event, and information regarding the position or location of the first communication device or second communication device; and determining whether the bet is allowed or disallowed using the position or location information. *See* Abstract, '755 Patent.

27.  As noted, the claims of the Asserted Patents have priority to at least May 31, 2002. At that time, the use of geolocation and global positioning as an integral data point in the processing of mobile wagers was still many years away. For example, the first GPS chip to be incorporated into a mobile device with sufficient sensitivity to assess the ability of an individual to place a wager in a given jurisdiction was the GL20000 GPS Chip, which was first used in the HP iPaq in 2005.

28.    Still further, the current industry leader in the space – GeoComply – did not even exist until 2011, nearly a full decade later than the nominal date of invention in May 2002. *See, e.g., https://www.geocomply.com/about-us/.* This fact alone is compelling evidence of the non-routine and unconventional inventive concepts captured in the claims of the Beteiro Patents.

29.    The claims of the Asserted Patents are not drawn to laws of nature, natural phenomena, or abstract ideas. Although the systems and methods claimed in the Asserted Patents are ubiquitous now (and, as a result, are widely infringed), the specific combinations of elements, as recited in the claims, were not conventional or routine at the time of the invention.

30.    Further, the claims of the Asserted Patents contain inventive concepts which transform the underlying non-abstract aspects of the claims into patent-eligible subject matter.

31.    Consequently, the claims of the Asserted Patents recite apparatuses and methods resulting in improved functionality of the claimed systems and represent technological improvements to the operation of computers. The claims of the Asserted Patents provide a basis for legally compliant remote wagering, increased accessibility to wagering platforms, increased opportunity for wagering providers, increased accessibility to wagering information to wagerers, reduced fraud, and more secure transactions among wagering providers and wagerers. *See, e.g.,* '920 Patent at 2:5-7:58.

32.    The claims of the Asserted Patents overcome deficiencies existing in the art as of the date of invention, and comprise non-conventional approaches that transform the inventions as claimed into substantially more than mere abstract ideas. For example, as of the date of invention, "[w]hile many individuals enjoy gambling and/or enjoy engaging in gaming activities and/or gambling activities, they may not always have access to particular gaming venues or gaming activities. Further, while many individuals may also be interested in making a gaming and/or gambling

experience more interesting, more challenging, and/or more exciting, they typically do not have access to certain information, products, and/or services, for enhancing their experience or experiences." '920 Patent at 1:44-52.  The inventions as claimed overcome these deficiencies in the state of the art, and provide a means by which interested parties can access gambling services remotely, while preserving geographic restrictions on such access.  As explained, as of the date of invention, "prior art gaming systems and/or gambling systems, as well as conventional gaming practices and/or gambling practices, have failed to provide the gaming community with services, products, and/or other offerings, which would provide for more enhanced gaming and/or gambling activities, environments, and/or experiences." '920 Patent at 1:53-58.

33. As of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context.  As explained: "The present invention can be utilized to facilitate compliance with the various and respective state, country, and/or sovereignty, gaming laws and/or gambling laws and/or so as to facilitate any reporting of gaming activities and/or gambling activities to the appropriate state, country, and/or sovereignty, authorities and/or so as to facilitate any payments of fees and/or taxes relating to the gaming activities and/or gambling activities." '920 Patent at 16:14-21.  Indeed, one of the express objects of the inventions as claimed was "to provide an apparatus and method for facilitating gaming activity and/or gambling activity which utilize global positioning technology in order to ascertain the jurisdiction in which or from which a bet is placed." '920 Patent at 26:14-18.  Such a solution was unconventional as of the date of invention, especially in view of the state of the art at the time, which was dependent upon in-person wagering.

34.    The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing a means by which gambling platform providers could more effectively market various gaming activities to wider audiences.  As explained, the inventions as claimed overcome these deficiencies by "allow[ing] a user or player to access a central processing computer and search for a gaming activity, gaming activities, a gaming event, or gaming events, in which the user or player may desire to bet or participate."  '920 Patent at 32:6-10.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day by making it possible to expose more individuals to the various gaming options available in the market.

35.    The inventions as claimed further overcome the deficiencies existing in the art as of the date of invention by providing methods and apparatuses for providing wagering opportunities on an increased scale over traditional person-to-person live wagering.  As explained, the inventions as claimed overcome prior deficiencies in this regard because "the apparatus 100 also includes any number of user computers or user communication devices 20."  '920 Patent at 35:65-67.  As such, the inventions as claimed provide non-conventional solutions to the conventional problems of the day because the wagering platform providers can maximize the number of wagers made without a proportional increase in overhead, wagering equipment/terminals, or employee capacity.

36.    As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering.  A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants.  Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context by unconventionally adapting the mobile devices used by wagering participants so as to create new mobile gaming machines.  As explained: "[T]he user communication device

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          14

20 can also include a global positioning device 20J for determining the position or location of the user communication device 20. In a preferred embodiment, the global positioning device 20J can be utilized to determine the position or location of the user communication device 20 so as to, for example, determine a jurisdiction in which the user communication device 20 is located and/or is being utilized." '920 Patent at 44:37-44. As such, the inventions as claimed provided non-conventional solutions to the conventional problems of the day. Indeed, the very infringing scenarios in existence today were contemplated and foreseen by the inventor many years ago: "In another preferred embodiment, wherein the user communication device 20 is a wireless communication device and/or a mobile communication device (*i.e.* personal digital assistant, wireless videophone, wireless telephone, or palm-held device, etc., which can be equipped with a global positioning system (GPS) device 20J), the location of the user communication device 20 and, therefore, the location from which the gaming activity and/or gambling activity originates and/or from which it takes place can be determined by the user communication device 20 automatically transmitting position data and/or information to the respective central processing computer 10 and/or gaming facility computer 30 at the time of the user's accessing of the respective central processing computer 10 and/or gaming facility computer 30." '920 Patent at 80:10-24. Again, this scenario was far from conventional as of the date of invention, as evidenced by the fact that the first iPhone was not introduced to the market until 2007, and the common "app-store" did not exist until 2008, many years after the date of invention. *https://en.wikipedia.org/wiki/IPhone* and *https://en.wikipedia.org/wiki/App_Store_(iOS/iPadOS).* Moreover, as of 2002, it was effectively illegal in the United States to even wager on athletic events, much less to do so remotely. More specifically, the Professional and Amateur Sports Protection Act of 1992 was the federal law in effect from October 1992 until it was declared unconstitutional by the United States

Supreme Court in May 2018. *See Murphy v. National Collegiate Athletics Association,* 138 S.Ct. 1461 (2018). In view of the prevailing and long-standing laws in the United States, the inventive concepts captured in the claims of the Beteiro Patents were plainly unconventional and non-routine.

37.     As noted, as of the date of invention (and still today), different jurisdictions had different laws relating to gambling activities, but no effective way to administer and regulate electronic and online wagering. A key problem as of the date of invention was the inability of wagering platform providers to geographically restrict access by remote participants. Accordingly, the inventions as claimed provided a technological solution to the technological problems arising in the online wagering context by creating unconventional central processing computers specially programmed to assess the legality of proposed wagers in real-time. As explained: "At step 2003, the respective central processing computer 10 and/or gaming facility computer 30 can determine if the remote gaming activity and/or gambling activity is allowed by the state having jurisdiction over the remote gaming activity and/or gambling activity. If, at step 2003, the respective central processing computer 10 and/or gaming facility computer 30 determines that the remote gaming activity and/or gambling activity is disallowed by the identified state having jurisdiction over same, then the operation of the apparatus 100 will proceed to step 2004 and the respective central processing computer 10 and/or gaming facility computer 30 will cancel the respective bet, wager, and/or gaming activity and/or gambling activity." '920 Patent at 80:37-50. As such, the claimed "central processing computer" does not merely comprise standard conventional hardware and software; rather, as claimed, it advances the functionality of the computer as a useful tool in the electronic processing of wagers, the prevention of illegal gambling, and providing a measure of compliance on the part of wagering platform providers.

38.     As noted above, during prosecution of each of the '920 Patent, the '341 Patent, and the '266 Patent, the Primary Patent Examiner specifically considered whether the claims at issue were eligible under 35 USC §101 in view of the United States Supreme Court's decision in *Alice*. In each instance, after due consideration, the Primary Patent Examiner expressly found that the claims are in fact patent eligible under 35 USC §101 because: (i) all claims explicitly require the use of a particular machine or processor to detect the posting of information; (ii) all claims explicitly require the use of a particular machine or processor to generate and transmit a notification message to a communication device; (iii) all claims explicitly require the use of a particular machine or processor for receiving a bet message including location information; and (iv) all claims explicitly require the use of a particular machine or processor to determine whether the bet is allowed or disallowed by using GPS. The Primary Patent Examiner was, in each instance, correct. For these same reasons, all of the claims of the Asserted Patents are patent-eligible.

39.     The '920 Patent was examined by Primary United States Patent Examiner Jasson Yoo. During the examination of the '920 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: CPC, A63F 13/00; A63F 9/24; G07F 17/32; G07F 17/3244; G07F 17/3237; G07F 17/3223; and G07F 17/3288.

40.     After conducting a search for prior art during the examination of the '920 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii) US6113493; (iii) US2002/0002075; (iv) US2002/0054088; (v) US2002/0098829; (vi) US6443841; (vii) US2002/0147049; (viii) US20020183105; and (ix) US6508709.

41.     After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States

Patent Examiner allowed all of the claims of the '920 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '920 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '920 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

42.    The '920 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

43.    The '341 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '341 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

44.    After conducting a search for prior art during the examination of the '341 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; (ii) US9965920; and (iii) 2002/0183105.

45.    After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '341 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '341 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '341 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

46.    The '341 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

47.    The '266 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '266 Patent, the United States Patent Examiner searched for prior art in the following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

48.  After conducting a search for prior art during the examination of the '266 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6104815; and (ii) 2002/0183105.

49.  After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '266 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims. *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '266 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '266 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

50.  The '266 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

51.  The '755 Patent was examined by Primary United States Patent Examiner Jasson Yoo.  During the examination of the '755 Patent, the United States Patent Examiner searched for prior art in the

following US Classifications: G07F 17/3237; G07F 17/3288; G07F 17/3223; G07F 17/3244; and G07F 17/32.

52.    After conducting a search for prior art during the examination of the '755 Patent, the United States Patent Examiner identified and cited the following as the most relevant prior art references found during the search: (i) US6106815; and (ii) 2002/0183105.

53.    After giving full proper credit to the prior art and having conducted a thorough search for all relevant art and having fully considered the most relevant art known at the time, the United States Patent Examiner allowed all of the claims of the '755 Patent to issue.  In so doing, it is presumed that Examiner Yoo used his knowledge of the art when examining the claims.  *K/S Himpp v. Hear-Wear Techs., LLC,* 751 F.3d 1362, 1369 (Fed. Cir. 2014).  It is further presumed that Examiner Yoo has experience in the field of the invention, and that the Examiner properly acted in accordance with a person of ordinary skill.  *In re Sang Su Lee,* 277 F.3d 1338, 1345 (Fed. Cir. 2002).  In view of the foregoing, the claims of the '755 Patent are novel and non-obvious, including over all non-cited art which is merely cumulative with the referenced and cited prior art.  Likewise, the claims of the '755 Patent are novel and non-obvious, including over all non-cited contemporaneous state of the art systems and methods, all of which would have been known to a person of ordinary skill in the art, and which were therefore presumptively also known and considered by Examiner Yoo.

54.    The '755 Patent is a pioneering patent, and has been cited as relevant prior art in over 25 subsequent United States Patent Applications, including Applications Assigned to such technology leaders as Marketmaker Software, Ebay, Apple, WMS Gaming, Sony, Intralot, Joingo, and Metric Gaming.

55.    The claims of the Asserted Patents were all properly issued, and are valid and enforceable for the respective terms of their statutory life through expiration, and are enforceable for purposes of seeking damages for past infringement even post-expiration.  *See, e.g., Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.,* 655 F.3d 1291, 1299 (Fed. Cir. 2011) ("[A]n expired patent is not viewed as having 'never existed.'  Much to the contrary, a patent does have value beyond its expiration date.  For example, an expired patent may form the basis of an action for past damages subject to the six-year limitation under 35 U.S.C. § 286") (internal citations omitted).

56.    The expiration dates of the Beteiro Patents are at least the following: the '920 Patent expires no earlier than May 19, 2023; the '341 Patent expires no earlier than May 19, 2023; the '266 Patent expires no earlier than May 19, 2023; and the '755 Patent expires no earlier than May 19, 2023.

## THE ACCUSED INSTRUMENTALITIES

57.    Upon information and belief, each respective Defendant makes, sells, advertises, offers for sale, uses, or otherwise provides a plurality of gambling and event wagering services, including but not limited to providing and supporting its respective branded Accused Mobile Wagering Platforms, which are individually comprised of hardware (including servers) and software (including source code).  On information and belief, such hardware and software are made, used, sold, offered for sale, and tested on the authority and under the direction of each respective Defendant.  Such branded Accused Mobile Wagering Platforms are each individually and collectively directly accessible to users in the United States through the Internet domains and mobile applications of each respective Defendant.  On information and belief, the infringing systems each comprise servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of each respective Defendant which collectively and respectively operate as single controlled apparatuses to administer the branded

Accused Mobile Wagering Platforms of the Defendants in the United States.  On information and belief, the branded Accused Mobile Wagering Platforms offered by Defendants are respectively marketed as: (i) FanDuel Sportsbook [by Defendant Betfair Interactive]; (ii) FoxBet [by Defendant TSG Interactive]; and (iii) TVG and 4NJBets [by Defendant ODS Technologies]; each of which further including the various State-Specific versions of each respective domain and the associated Mobile Applications for each such branded domain, including but not limited to the FoxBet Sportsbook & Casino Mobile App, the FanDuel Sportsbook & Casino Mobile App, the TVG Sports Racing Betting Mobile App, and the 4NJBets Horse Racing Betting Mobile App (collectively the "Accused Domains").  Collectively, all of the foregoing comprise the "Accused Instrumentalities."   *See* Figure Group A (comprised of Figure Groups A.1 [FanDuel]; A.2 [FoxBet]; and A.3 [TVG/4NJBets]).



*See https://sportsbook.fanduel.com/sports.*











*See https://play.google.com/store/apps/details?id=com.fanduel.sportsbook&hl=en_US&gl=US.*



*See https://www.legalsportsreport.com/46229/flutter-acquire-remainder-fanduel/.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          25

 

*See https://play.google.com/store/apps/details?id=com.fanduel.sportsbook&hl=en_US&gl=US.*

**FIGURE GROUP A.1 [FANDUEL]**



## How to Access Sports Betting

Players can start placing bets right now by visiting the homepage, or by downloading our app.

Login to place bets with your bankroll (there's no need to create a new account if you already play our poker, or other, games), and you can even place wagers while you wait for your next poker tournament to start.

If you're new, visit the homepage page to get started. Once you're up and running, follow the steps below to place your first bet.

See https://co.foxbet.com/#.



See https://www.foxbet.com/howtobet/.



See https://play.google.com/store/apps/details?id=uspa.foxbet.foxbet&hl=en_US&gl=US.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    27



*See https://sportshandle.com/fox-bet-sportsbook/.*

**FIGURE GROUP A.2 [FOXBET]**



*See https://www.tvg.com/.*

**Placing Your Bets**

Once your account is live, which will take a matter of minutes to complete, you can start placing your wagers but remember to read the rest of our guide first.

On TVG's main page you will see 'Horse Racing' at the top. Within this there is a 'Full Race Schedule' to look at with races from all over the world available to bet on. Simply click on the race you wish to wager in, take a look at the field and click on the horse you want to bet.

Your betting options will become visible then, all you have to do is enter the appropriate amount and click 'Bet Now' when you are ready to go!

*See https://www.tvg.com/promos/horse-racing-betting-guide.*





**FIGURE GROUP A.3 [TVG/4NJBETS]**

58.    On information and belief, the Accused Instrumentalities each collect, process, and utilize location information relative to the specific communication device (*e.g.,* the laptop computer or mobile device) of the Accused interactive Internet domain and/or mobile application associated with individual users of the respective Accused Wagering Platforms. On information and belief,

acceptance and use of such location information is a requirement imposed by each respective Defendant on all users of the infringing Accused Instrumentalities in the United States. *See* Figure Group B (comprised of Figure Groups B.1 [Fanduel]; B.2 [FoxBet]; and B.3 [TVG/4NJBets]).

> 5.1.8. You consent to the monitoring and recording by the Division of Gaming of any wagering communications and geographic location information;

> Categories of personal information we collect. Throughout this Privacy Policy, we discuss in detail the specific pieces of personal information we collect from and about users. Under the CCPA, we are also required to provide you with the "categories" of personal information we collect. The categories we may collect are: identifiers (such as name, address, email address, driver's license); commercial information (such as deposit or wagering data); financial data (such as payment information); Internet or other network or device activity (such as browsing history or Services usage); geolocation information (e.g., your city and state based on IP address); audio information (e.g., if you participate in a customer support call and do not opt out of call recording); inference data about you; in certain circumstances, information used to manage potential fraud or legal risk (such as employment status and criminal history); photos (e.g., if you voluntarily submit a photo); and other information that identifies or can be reasonably associated with you.

*See https://d38ayms4az88sz.cloudfront.net/SB/CO/2021-05-07T00-00-00.html.*



*See https://fanduelsportsbook.zendesk.com/hc/en-us/categories/360003231033-Geolocation-Location-Eligibility-.*

> 21.2. **Location Services.** In this Section 21.2, "Cellular Provider" means AT&T, Sprint, T-Mobile, Verizon or any other cellular provider that you use to access the Services and/or play the games and/or make sports wagers. By accepting the Terms you are providing permission to BIU to obtain your location using your cell phone. It is necessary for BIU to collect this information in order to validate that you are located within the legal gaming area of the State of Colorado and to allow you to access the Services, play the games and place sports wagers. You are also consenting to BIU retaining your location data for ten (10) years before deleting it. You also agree to those details being shared with the Division of Gaming upon request. The Services use location data. By using the Services, you allow your wireless carrier to share your location with others. There is no representation, warranty or guarantee of accuracy, completeness or timeliness of any location data, product, or service. The Services were not developed by a Cellular Provider. If you use the Services, it may require your Cellular Provider to disclose your customer information, including location information, to BIU or a third party. By providing your consent, you authorize your Cellular Provider to disclose your information to BIU and to third parties in order to enable this application. See our Privacy Policy for more information about how BIU will collect, access, use, and disclose your information. You acknowledge and agree that (1) your relationship with BIU is separate from your relationship with your Cellular Provider; (2) Your Cellular Provider is not responsible for the Services; and (3) you will hold harmless your Cellular Provider and its subsidiaries, affiliates, officers, employees, agents, successors, and assigns from any judgments, claims, actions, losses, liabilities, or expenses arising from or attributable to the Services or the acts or omissions of BIU.

*See https://d38ayms4az88sz.cloudfront.net/SB/CO/2021-05-07T00-00-00.html.*

If you or someone you know has a gambling problem and wants help, call 1-800-Gambler.
This site has been authorized by the State of New Jersey, Division of Gaming Enforcement for use by registered users physically present in New Jersey.
For Regulator, Law Enforcement or similar inquiries ONLY, please call (732) 646-6232. Do NOT use for customer requests or questions. For customer support please contact us here.

*See https://sportsbook.fanduel.com/sports.*

### FIGURE GROUP B.1 [FANDUEL]

**4.3** in compliance with our regulatory requirements and in order for you to access and use the Software and/or the Service through any of the Sites you will need to provide us with certain personal details about yourself (including details regarding your methods of payment) as well as consenting us (or third parties acting on our behalf) to have access to or make of your location data ("**Geolocation Services**") and/or such other data or information that may be derived from your PC/Device, to enable the Service/Software to be made available to you. Geolocation Services reports your physical location from your PC or Device. Geolocation Services obtain your physical location by accessing your IP address, MAC address, RFID, Wi-Fi positioning system, Device GPS coordinates or other method. The Geolocation Services report to us, Third Party Providers and/or the DGE the physical and geographic location of your PC or Device. It is possible that your precise or near-precise physical location will be reported to us, Third Party Providers and/or the DGE when you access the Sites, use the Software and/or the Services. You hereby consent to us (or third parties acting on our behalf) to access and use such data for the purposes outlined above. You are not permitted to use the Software and/or the Service if you do not wish to be bound by this provision. Provider will process your personal details in compliance with the applicable data protection laws and regulations, all in accordance with and as set out in our Privacy Policy.

"Bet with your head, not over it." If you or someone you know has a gambling problem and wants help, call 1-800-Gambler. Copyright © 2001-2021 Rational Intellectual Holdings Limited. All rights reserved. TSG Interactive US Services Limited is the internet gaming operator of Resorts Digital Gaming LLC (d/b/a "Resorts"), authorized and regulated by the New Jersey Division of Gaming Enforcement. NJ Permit No. NJIGP 18-008. It is a Federal offense for persons physically located outside of New Jersey to engage in Internet wagering through this website.
Terms of Service | Privacy Policy | Responsible Gaming

*See https://www.foxbet.com/tos/.*

### FIGURE GROUP B.2 [FOXBET]

## Location Services Requirements

[ Follow ]

Some states require that you share your location so they can verify you are in a legal wagering state. If you already have Location Services enabled, you may be asked to allow TVG to view your location, and you must agree in order to be able to wager. If you have Location Services blocked or disabled, you will need to reset your location settings to allow TVG to detect your location.

*See https://support.tvg.com/hc/en-us/articles/360007116293-Location-Services-Requirements.*

### FIGURE GROUP B.3 [TVG/4NJBETS]

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    31

59.    On information and belief, the Accused Instrumentalities are each compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to one or more of the following: (i) Colorado, as licensed and regulated by the Colorado Department of Revenue – Division of Gaming; (ii)  Illinois, as licensed and regulated by the Illinois Gaming Board; (iii) Indiana, as licensed and regulated by the Indiana Gaming Commission; (iv) Iowa, as licensed and regulated by the Iowa Racing and Gaming Commission; (v) Michigan, as licensed and regulated by the Michigan Gaming Control Board; (vi) New Hampshire, as licensed and regulated by the New Hampshire Lottery Commission; (vii) New Jersey, as licensed and regulated by the New Jersey Division of Gaming Enforcement; (viii) Pennsylvania, as licensed and regulated by the Pennsylvania Gaming Control Board; (ix) Tennessee, as licensed and regulated by the Tennessee Education Lottery Corporation; (x) Virginia, as licensed and regulated by the Virginia Lottery; (xi) West Virginia, as licensed and regulated by the West Virginia Lottery Commission; (xii) Montana, as licensed and regulated by the Montana Lottery; (xiii) Nevada, as licensed and regulated by the Nevada Gaming Commission; (xiv) Oregon, as licensed and regulated by the Oregon Lottery; and (xv) Rhode Island, as licensed and regulated by the Rhode Island Lottery.

60.    On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to the United States Unlawful Internet Gambling Enforcement Act of 2006 (31 U.S.C. §§ 5361-5367).

61.    On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers,

including but not limited to the Colorado Department of Revenue – Enforcement Division, Gaming Sports Industry Bulletin Number 3, dated April 20, 2020.

62.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Section 1900.1430 of Title 11, Section E, Chapter I of the Illinois Administrative Code.

63.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to: (i) Chapter 11 of Indiana Title 68 – Indiana Gaming Commission Emergency Rule 20-448E, dated August 17, 2020; and (ii) IC 4-38-3-1 of Indiana Title 4 (Indiana Sports Wagering Statute).

64.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Technical Bulletin 2020-01, dated August 6, 2020, as issued by the Michigan Gaming Control Board.

65.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Section 287-I:7 of Title XXIV of the New Hampshire Statutes.

66.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Section 2(m) of New Jersey Assembly Bill 4111, dated June 4, 2018.

67.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers,

including but not limited to the Pennsylvania Expanded Gaming Act, as well as Section 809.07 of Title 58 of the Pennsylvania Code.

68.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Rule 15.1.7 (Q) of Chapter 15 of the Tennessee Sports Gaming Regulations, as promulgated by the Tennessee Education Lottery Corporation, as well as the TELC Technical Bulletin Issued August 24, 2020 relating thereto.

69.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Section 50.1-4034 of Title 58.1, Chapter 40, of the Virginia State Code.

70.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Section 29-22D-15 of West Virginia 2018 Senate Bill 415.

71.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Montana House Bill 725 (2019).

72.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Sections 22.140 and 22.145 of Regulation 22 of the Nevada Gaming Control Board.

73.     On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers,

including but not limited to Section 177-092-0025 of Chapter 177, Division 92 as promulgated by the Oregon State Lottery.

74. On information and belief, the Accused Instrumentalities are compliant with the mobile gambling laws and regulations of the jurisdictions in which the Accused Wagering Platforms accept wagers, including but not limited to Sections 20.20(H) and 20.32 of the Rhode Island Lottery Rules and Regulations, dated December 2020.

## COUNT I
## Infringement of U.S. Patent No. 10,043,341

75. Plaintiff incorporates the above paragraphs by reference.

76. Defendants have each been on actual notice of the '341 Patent at least as early as the date it received service of the Original Complaint in this litigation.

77. Upon information and belief, Defendants each own and control the operation of the respective Accused Instrumentalities and generates substantial financial revenues therefrom.

78. Upon information and belief, each Defendant has directly infringed and continues to directly infringe at least Claim 13 of the '341 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities. Each respective Defendant directly makes the respective infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling each respective system as a whole and by obtaining the benefits therefrom. More specifically, and on information and belief, each respective Defendant: (i) developed and maintains the infringing Accused Domains; (ii) authored and owns the source code on which the branded Accused Mobile Wagering Platforms function; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware,

including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the branded Accused Mobile Wagering Platforms; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities. *See* Figure Groups A, B, and C. Each respective Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them individually and collectively available in the United States. Further, and on information and belief, each Defendant has directly infringed by using the respective infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. More specifically, in order to maintain legal compliance in the United States, each respective Defendant is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use. Such testing and legal compliance necessarily requires each respective Defendant to make and use the respective Accused Instrumentalities in an infringing manner. Still further, each respective Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the respective infringing Accused Instrumentalities. *See* Figure Group A.

79.   The Accused Instrumentalities each individually comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event. As noted above, and on information and belief, the Accused Instrumentalities each comprise the branded Mobile Wagering Platforms, which are each individually comprised of hardware (including servers) and software (including

source code).  Such branded Mobile Wagering Platforms are each directly accessible to users in the United States through the Accused Domains.  On information and belief, the Accused systems comprise servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of Defendants which collectively operate as individual single controlled apparatuses to administer the branded Accused Mobile Wagering Platforms in the United States.  The existence of the branded Accused Mobile Wagering Platforms each necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers.  As illustrated immediately below, each such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events, for each respective Accused Mobile Wagering Platform.  Such activities individually and collectively comprise "processing information for providing for a placement of a bet."  *See* Figure Group C (comprised of Figure Groups C.1 [Fanduel]; C.2 [FoxBet]; and C.3 [TVG/4NJBets]).



*See https://sportsbook.fanduel.com/live.*

## Why do I have a deposit limit on my account?

1 year ago · Updated

In accordance with state requirements, FanDuel has enacted deposit limits of $1,000 per month for users physically located in Massachusetts, $2,500 for users physically located in Tennessee, and $5,000 for users physically located in Maryland.

If you would like to increase your deposit limit, please reach out to our Customer Support Team.

Please keep in mind that depending on your request and state of residence, you may be required to show proof of income or assets.

## How do I withdraw money?

1 year ago · Updated

You can withdraw your winnings at any time through PayPal, online banking, or by requesting a check. Here is what you need to provide to verify your identity and withdraw:

- A valid mailing address
- Your Birthday
- Your social security number, or social insurance number for Canadian users.

Not only does this let us make sure you're really you, we'll need this info to file the right tax forms at the end of the year.

If you withdraw via PayPal it takes 48 hours to process. If you withdraw via online banking it takes 2-4 business days to process. If you withdraw via check, it should arrive within 7 to 10 business days.

*See https://support.fanduel.com/hc/en-us.*

13. Winnings, Payment and Consent to Paperless Delivery of Tax Documents

13.1. All cleared winnings will be credited to the customer's Account. Please see Section 7.2 for details on withdrawal methods.

13.2. Results will be as published and confirmed by the relevant governing body or as otherwise generally accepted.

13.3. he maximum payout to any one (1) customer in any twenty-four (24) hour period regardless of size of stake or number of Bets are as set out in the House Rules or as specified on the Bet Receipt, whichever is the lesser sum. Currency equivalent maximum payouts will apply for any currency not listed in the House Rules .

13.4. It is strictly the duty of the customer to stay within the limits set out in the House Rules and FanDuel Sportsbook will not under any circumstances pay any amounts in excess of these limits to a customer for any purported winnings exceeding these limits.

13.5. Any questions relating to a Bet must be raised no later than six months after the last event in the Bet has been settled. We cannot guarantee that we will be able to respond to your question if it is not raised within this time.

13.6. We may use your username and/or first name and/or initials and state and any winnings you may have had for advertising or promotional purposes without additional compensation.

13.7. In accordance with N.J.A.C 13:69D-1.60(s), jackpot wins greater than $50,000 may be subject to withholding should the jackpot winner be in arrears on child support obligations. This regulation requires GNor Blt.to access a New Jersey State website to verify the obligation to withhold. Procedures for withholding shall be in compliance with the procedures as set forth by the New Jersey Office of Child Support Services. Notification to the jackpot winner will be made in the event withholdings are applicable.

13.8.

We report winnings to the Internal Revenue Service (IRS) and the State of New Jersey Division of Taxation, for:

13.8.1. Any bet which results in proceeds of $1,200.00 or more from a slot game; or

13.8.2. Any bet which results in proceeds of $600.00 or more where the winnings are at least 300 times the amount of the wager.

We also withhold taxes on any bet which results in proceeds of $5,000.00 or more where the winnings are at least 300 times the amount of the wager. We withhold 24% of the proceeds and remit such amount to the Internal Revenue Service (IRS). We also withhold 3% of the proceeds and remit such amount to the State of New Jersey Division of Taxation.

If you are subject to IRS reporting requirements, we will send you Form W2-G summarizing the information for tax purposes by January 31st of the year following the end of the tax year of winning.

*See https://d38ayms4az88sz.cloudfront.net/SB/NJ/2021-04-19T00-00-00.html#partA13.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    38





*See https://www.youtube.com/watch?v=rdoo6ACc7F8.*

## FIGURE GROUP C.1 [FANDUEL]



*See https://co.foxbet.com/#/.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

---

**1. "REAL MONEY" GAMES**

**1.1** Lady Luck, through TSG Interactive US, offers real money games such as fixed-odds sports betting and pool betting ("**RM Games**"), as applicable, on the Services, on the terms and conditions governing your play on RM Games set out in this Agreement. The RM Games offered to you are owned by TSG Interactive US or are licensed (in whole or in part) to TSG Interactive US from third party owners or licensors.

**1.2** The additional terms and conditions governing your play on RM Games follow below.

**2. ELIGIBILITY**

**2.1 Eligibility**. A gaming account for your use of the RM Games on the Services (a "**Gaming Account**") will be opened upon your registration and making your first deposit subject to Provider verifying to our satisfaction your identity and eligibility in accordance with C.R.S. § 44-30-1506-, including, but not limited to, based on the following criteria, and you hereby expressly consent to this verification process:

---

*See https://co.foxbet.com/tos/#/realmoney.*

---

**FOX Bet Deposit Methods**

You can deposit money into your bankroll directly in the FOX Bet app, at foxbet.com, or at select casino locations in New Jersey and Pennsylvania. Whether you're most comfortable with cash, credit, or an eWallet, FOX Bet has a deposit option to fit your needs.

**Credit Cards:** FOX Bet accepts Visa and Mastercard.

**Debit Cards:** Make deposits via Visa and Mastercard affiliated debit cards.

**ACH e-Check Bank Transfer:** Those who wish to transfer funds directly from their checking account can do so via ACH transfer.

**Bill Payment:** If your bank offers a bill pay function, you can simply at FOX Bet as a payee to make online transfers into your bankroll.

**PayPal:** Bettors can use a pre-funded PayPal accounts to deposit at FOX Bet. As the world's most popular eWallet, PayPal at FOX Bet provides bettors a quick and secure payment method that does not require them to reveal credit card or personal banking info.

**PayNearMe:** PayNearMe allows bettors to fund their account with cash. Simply visit a local PayNearMe location (all 7/11 locations, for example) and make a cash deposit directly into your FOX Bet account.

**Cash:** Cash deposits are accepted at the Resorts Casino, 1133 Boardwalk, Atlantic City, NJ 08401.

**Skrill:** Like PayPal, Skrill is an eWallet that allows you to electronically transfer funds to your FOX Bet account without directly providing your banking info.

**Play+ PrePaid Card:** Fund the Play+ card with the payment method of your choice, and then use it to deposit directly into your FOX Bet account. The Play+ card can be used to make ATM withdrawals or used as a credit card anywhere that accepts Discover.

---

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                          40

## Withdrawals at FOX Bet

FOX Bet also offers a wide range of withdrawal options. Play+ and cash withdrawal methods are instant, while eWallets, and bank transfers come with a short processing time.

Simply click "Cashier" and select "Withdraw" in the desktop lobby or mobile app to make a deposit.

| Withdrawal Method | Advertised Processing Time | Minimum |
|---|---|---|
| Bank Transfer (ACH) | 3 – 10 business days | $10 |
| Cash | Instant | $10 |
| PayPal | Less than 24 hours | $10 |
| Skrill | Less than 24 hours | $10 |
| Pre-Paid Play+ | Instant | $10 |

Note that withdrawal options are limited to the options above according to Pennsylvania online gaming regulations.

*See https://www.sportsbettingdime.com/sportsbooks/fox-bet/#sportsbook.*

**7.4** You may receive a copy of a report detailing your game and account history and the activities in your Gaming Account by accessing this on the Services by following the instructions specified on the **Responsible Gaming** page. If you have questions, please email support@foxbet.com.

e. you are solely responsible for any applicable taxes which may be payable on cash or prizes awarded to you through your use of the Services. Without limiting the foregoing, Provider shall be entitled in its sole discretion to deduct and withhold from any cash, prizes, or other amounts or items of value awarded to you such taxes (including withholding taxes) as may be required under any federal, state, or local law, regulation or IRS requirement, at the maximum applicable rate for such withholding, and/or to require from you such information or documentation as may be necessary or desirable in connection with such filings as Provider may be required to make under any such federal, state, or local law, regulation, or IRS requirement, and/or to withhold or delay any payment or credit to your Gaming Account for such time as may be necessary in order to fulfil the foregoing requirements. In respect to any reporting of winnings that Provider is required to make (as may be required under any federal, state, or local law, regulation, or IRS requirement) due to a transaction on your Gaming Account, you (a) declare under penalties of perjury that (i) the name, address and taxpayer identification number supplied by you to open your Gaming Account correctly identifies you and (ii) you are the recipient of the winnings and that no other person is entitled to any part of these payments, and (b) agree that any forms required to be prepared by us and sent to you can be sent to you electronically;

*See https://co.foxbet.com/tos/.*

## FIGURE GROUP C.2 [FOXBET]



**Horse Racing Betting**

Nothing beats the sensation of betting on your favorite horse at the track, which is why TVG takes you right to the heart of the action. There are no restrictions on winners on any of our horse racing tracks, and you'll be able to choose winners from the comfort of your home.

Increase your odds and gain an edge over the competition with our Daily TVG picks, and hear exactly what industry experts such as Simon Bray, Britney Eurton and Christina Blacker think about upcoming races.

From your computer or mobile device, you can watch and bet on live horse racing from over 150 tracks worldwide! TVG offers live odds, handicapping picks and tips, and results.

Check out the action from tracks such as: Del Mar, Saratoga, Santa Anita, Belmont, Gulfstream, Churchill Downs, Monmouth Park, and Keeneland.

View our exclusive race content from TVG News and bet on the Kentucky Derby, Preakness Stakes, Belmont Stakes, Pegasus World Cup, and Breeders' Cup with TVG.

Do you want to know the basic about wagering? Check for more information our horse betting guide and the horse betting terms list explained.

New customers can click here to create an account or here to claim our generous sign-up offer!

*See https://www.tvg.com/.*

6. **WAGERING ACCOUNT BALANCE, DEPOSIT, AND WITHDRAWAL PROCEDURES**
Account deposits will be made available for customer use in accordance with normal financial industry availability standards. Deposits may be subject to deposit fee charges. Withdrawal requests will be processed within five (5) business days after receipt. The availability of withdrawn funds is subject to standard banking restrictions.

Your account balance bears no interest.

You can check account balances through our various wagering platforms or by calling our Customer Relations Representatives at 1-888-PLAY-TVG (752-9884)

*See https://www.tvg.com/info/termsandconditions#h_39748333352291515096069477.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    42





*See https://support.tvg.com/hc/en-us/categories/360002859893-Funding.*



*See https://support.tvg.com/hc/en-us/categories/360002854174-Account-Management.*

**FIGURE GROUP C.3 [TVG/4NJBETS]**

80.    The aforementioned computer(s) of each of the Accused Instrumentalities include at least one

         receiver, which is configured to receive requests to notify individual users regarding the sporting

         event for which wagers can be placed.  More specifically, when a user logs into or accesses the

infringing branded Accused Mobile Wagering Platforms via the Accused Domains, the respective infringing apparatus receives a set of user credentials which serve as a request to be notified of available sporting events for which wagers can be placed. On information and belief, once the user logs into or accesses the respective infringing branded Accused Mobile Wagering Platform via the Accused Domains, the infringing apparatus stores information regarding the request to be notified in memory. The stored information is used, *inter alia*, to assist in designating the user as "logged in" or "logged out" of an account maintained on the respective branded Accused Mobile Wagering Platform.

81.     In addition, or in the alternative, the receiver of the respective branded Accused Mobile Wagering Platform is configured such that it receives incoming HTTP requests from users accessing the Accused Domains via a web browser or application. Such HTTP requests initiate a dynamic and interactive session with the corresponding branded Accused Mobile Wagering Platform. The incoming request for information is a request to be notified regarding available sporting events for which wagers can be placed; such requests are stored and satisfied when the infringing apparatus returns page content to the user via the corresponding branded Accused Mobile Wagering Platform.

82.     The apparatus of the Accused Instrumentalities each includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed and generates notification messages regarding such sporting events. Such processor detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status. Upon detection, the processor of the respective branded Accused Mobile Wagering Platform delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the Accused

Domains.  By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages to those who have requested such notifications via the Accused Domains.  On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the Accused Domains, which are assembled and displayed on the communication device associated with the individual user (such as, for example, the corresponding Accused Mobile Application on the user mobile device).  *See* Figure Groups A and C.

83.    The computer of each of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the corresponding branded Accused Mobile Wagering Platform via the Accused Domains.  Indeed, this is the primary purpose and objective of the Accused Instrumentalities.  More specifically, the user interfaces of the Accused Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the corresponding branded Accused Mobile Wagering Platform for fulfillment. *See* Figure Groups A and C.

84.    On information and belief, each branded Accused Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device.  Such global positioning devices determine the physical location of such communication devices, and are essential and required by each respective Defendant for all users of the Accused Instrumentalities; each respective Defendant thus places the whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices.  *See* Figure

Group B.  More specifically, and on information and belief, in order to make beneficial use of the branded Accused Mobile Wagering Platforms, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed.  Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the Accused Domains for seamless automatic installation and enablement.  In addition, and/or in the alternative, the branded Accused Mobile Wagering Platforms each processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

85.    On information and belief, each respective branded Accused Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

86.    On information and belief, the computer/processor of each branded Accused Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by each Defendant, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

87.    The foregoing infringement on the part of each respective Defendant has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '341 Patent.

88.    To the extent each Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '341 Patent, such infringement is and will be necessarily willful and deliberate.

89.    Each of Defendants' aforesaid activities have been without authority and/or license from Plaintiff.

## COUNT II
## Infringement of U.S. Patent No. 10,147,266

90.    Plaintiff incorporates the above paragraphs by reference.

91.    Defendants have each been on actual notice of the '266 Patent at least as early as the date it received service of the Original Complaint in this litigation.

92.    Upon information and belief, Defendants each own and control the operation of the respective Accused Instrumentalities and generates substantial financial revenues therefrom.

93.    Upon information and belief, each Defendant has directly infringed and continues to directly infringe at least Claim 1 of the '266 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.  Each respective Defendant directly makes the respective infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling each respective system as a whole and by obtaining the benefits therefrom.  More specifically, and on information and belief, each respective Defendant: (i) developed and maintains the infringing Accused Domains; (ii) authored and owns the source code on which the branded Accused Mobile Wagering Platforms function; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the branded

Accused Mobile Wagering Platforms; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities. *See* Figure Groups A, B, and C. Each respective Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them individually and collectively available in the United States. Further, and on information and belief, each Defendant has directly infringed by using the respective infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. More specifically, in order to maintain legal compliance in the United States, each respective Defendant is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use. Such testing and legal compliance necessarily requires each respective Defendant to make and use the respective Accused Instrumentalities in an infringing manner. Still further, each respective Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the respective infringing Accused Instrumentalities. *See* Figure Group A.

94.     The Accused Instrumentalities each comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event. As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the branded Accused Mobile Wagering Platforms, which are each comprised of hardware (including servers) and software (including source code). Such branded Mobile Wagering Platforms are each directly accessible to users in the United States through the Accused Domains. On information and belief,

the respective Accused systems each comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of Defendants which individually and collectively operate as a single controlled apparatus to administer the respective branded Accused Mobile Wagering Platforms in the United States. The existence of each branded Accused Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers. As illustrated in Figure Group C, each such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events. Such activities comprise "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event." *See* Figure Group C.

95.     The apparatus of each of the Accused Instrumentalities includes a specially programmed processor, which detects postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages regarding such sporting events and/or activities. Such processor detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status. Upon detection, the processor of each branded Accused Mobile Wagering Platform delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the Accused Domains. By way of example, the infringing processor detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the Accused Domains. On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the Accused Domains ("electronic transmission"), which are received, assembled, and displayed on the communication device

associated with the individual user (such as, for example, the Accused Mobile Application on the user mobile device). *See* Figure Groups A and C.

96. The computer of each of the Accused Instrumentalities is configured to receive bet messages transmitted from the communication devices of users of the corresponding branded Accused Mobile Wagering Platform via the Accused Domains. Indeed, this is the primary purpose and objective of the Accused Instrumentalities. More specifically, the user interfaces of the Accused Domains are each specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the corresponding branded Accused Mobile Wagering Platform for fulfillment. *See* Figure Groups A and C.

97. On information and belief, each branded Accused Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device. Such global positioning devices determine the physical location of such communication devices, and are essential and required by each respective Defendant for all users of the Accused Instrumentalities; each Defendant thus places each respective whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices. *See* Figure Group B. More specifically, and on information and belief, in order to make beneficial use of each branded Accused Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed. Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the respective Accused Domains for seamless automatic installation and enablement. In addition, and/or in the alternative, each

branded Accused Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

98.    On information and belief, each branded Accused Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

99.    On information and belief, the computer/processor of each branded Accused Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by each Defendant, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

100.    The foregoing infringement on the part of each Defendant has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '266 Patent.

101.    To the extent each Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '266 Patent, such infringement is and will be necessarily willful and deliberate.

102.    Each of Defendants' aforesaid activities have been without authority and/or license from Plaintiff.

**COUNT III**
**Infringement of U.S. Patent No. 10,255,755**

103.    Plaintiff incorporates the above paragraphs by reference.

104.    Defendants have each been on actual notice of the '755 Patent at least as early as the date it received service of the Original Complaint in this litigation.

105.    Upon information and belief, Defendants each own and control the operation of the respective Accused Instrumentalities and generates substantial financial revenues therefrom.

106.    Upon information and belief, each Defendant has directly infringed and continues to directly infringe at least Claim 2 of the '755 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.  Each respective Defendant directly makes the respective infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling each respective system as a whole and by obtaining the benefits therefrom.  More specifically, and on information and belief, each respective Defendant: (i) developed and maintains the infringing Accused Domains; (ii) authored and owns the source code on which the branded Accused Mobile Wagering Platforms function; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the branded Accused Mobile Wagering Platforms; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.  *See* Figure Groups A, B, and C.  Each respective Defendant further directly uses the infringing Accused Instrumentalities at least because it assembled the combined infringing elements and makes them individually and collectively available in the United States.  Further, and on information and belief,

each Defendant has directly infringed by using the respective infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities. More specifically, in order to maintain legal compliance in the United States, each respective Defendant is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use. Such testing and legal compliance necessarily requires each respective Defendant to make and use the respective Accused Instrumentalities in an infringing manner. Still further, each respective Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the respective infringing Accused Instrumentalities. *See* Figure Group A.

107.    The Accused Instrumentalities each comprise an apparatus including a computer, wherein the computer is specially programmed to perform the function of processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event. As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the branded Accused Mobile Wagering Platforms, which are each comprised of hardware (including servers) and software (including source code). Each such branded Accused Mobile Wagering Platform is directly accessible to users in the United States through the Accused Domains. On information and belief, each Accused system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of each respective Defendant which collectively operate as a single controlled apparatus to administer the respective branded Accused Mobile Wagering Platforms in the United States. The existence of each branded Accused Mobile Wagering Platform necessarily requires the presence and use of a specially programmed computer or computer system,

including Internet servers.  As illustrated in Figure Group C, each such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.  Such activities comprise a specially programmed computer for "processing information for providing for a placement of a bet on or regarding a gaming activity, a gambling activity, or a sporting event, a posting of information regarding the gaming activity, the gambling activity, or the sporting event."

108.    The apparatus of each of the Accused Instrumentalities includes a specially programmed processor, which is configured such that it detects and processes postings of information regarding gaming activities, gambling activities, and/or sporting events for which wagers can be placed and generates notification messages (with or using a computer) regarding such sporting events and/or activities.  More specifically, each such processor is specially configured such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status.  Upon detection, the processor of each branded Accused Mobile Wagering Platform is specially programmed such that it delivers and transmits notification messages, which are reflected and take the form of updated, new, or revised data displayed via the Accused Domains.  By way of example, each infringing processor is programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and transmits notification messages via the Accused Domains.  On information and belief, such notifications are programmed to be transmitted and delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the respective Accused Domains ("electronic transmission"), which are programmed to be received, assembled, and displayed on the communication device associated with the individual user (such

as, for example, the corresponding Accused Mobile Application on the user mobile device). *See* Figure Groups A and C.

109.    The computer of each of the Accused Instrumentalities is specially programmed such that it receives bet messages transmitted from the communication devices of users of the corresponding branded Accused Mobile Wagering Platform via the Accused Domains. Indeed, this is the primary purpose and objective of the Accused Instrumentalities. More specifically, the user interfaces of the Accused Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the corresponding branded Accused Mobile Wagering Platform for fulfillment. *See* Figure Groups A and C.

110.    On information and belief, each branded Accused Mobile Wagering Platform is specially programmed such that it requires users to provide at least one global positioning device for each communication device. Such global positioning devices determine the physical location of such communication devices, and are essential and required by each respective Defendant for all users of the Accused Instrumentalities; each Defendant thus places the respective whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices. *See* Figure Group B. More specifically, and on information and belief, in order to make beneficial use of each branded Accused Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed. Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the Accused Domains for seamless automatic installation and enablement. In addition, and/or in

the alternative, each branded Accused Mobile Wagering Platform is specially programmed such that it processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

111.   On information and belief, each branded Accused Mobile Wagering Platform is specially programmed such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

112.   On information and belief, the computer/processor of each branded Accused Mobile Wagering Platform is specially programmed such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by each Defendant, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

113.   The foregoing infringement on the part of each Defendant has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '755 Patent.

114.   To the extent each Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '755 Patent, such infringement is and will be necessarily willful and deliberate.

115.   Each of Defendants' aforesaid activities have been without authority and/or license from Plaintiff.

### COUNT IV
### Infringement of U.S. Patent No. 9,965,920

116.    Plaintiff incorporates the above paragraphs by reference.

117.    Defendants have each been on actual notice of the '920 Patent at least as early as the date it received service of the Original Complaint in this litigation.

118.    Upon information and belief, Defendants each own and control the operation of the respective Accused Instrumentalities and generates substantial financial revenues therefrom.

119.    Upon information and belief, each Defendant has directly infringed and continues to directly infringe at least Claim 16 of the '920 Patent by making, using, importing, selling, and/or, offering for sale the Accused Instrumentalities.  Each respective Defendant directly makes the respective infringing Accused Instrumentalities at least because it is solely responsible for putting the infringing system into service by directing and/or controlling each respective system as a whole and by obtaining the benefits therefrom.  More specifically, and on information and belief, each respective Defendant: (i) developed and maintains the infringing Accused Domains; (ii) authored and owns the source code on which the branded Accused Mobile Wagering Platforms function; (iii) took affirmative steps to assemble and finance the hardware (including servers and/or computers with receivers, memory, processors, and transmitters) on which the Accused Instrumentalities operate; (iv) manages and controls the functionality on all such hardware, including by managing and controlling the software in use on such hardware; (v) specifically embeds and/or requires the presence and use of global positioning devices as part of the branded Accused Mobile Wagering Platforms; (vi) assumes ownership, credit, and responsibility for the Accused Instrumentalities by its overt branding and advertising of same; and (vii) receives substantial financial returns from the infringing operations of the Accused Instrumentalities.  *See* Figure Groups A, B, and C.  Each respective Defendant further directly uses the infringing Accused

Instrumentalities at least because it assembled the combined infringing elements and makes them individually and collectively available in the United States.  Further, and on information and belief, each Defendant has directly infringed by using the respective infringing Accused Instrumentalities as part of its ongoing and regular testing and/or internal legal compliance activities.  More specifically, in order to maintain legal compliance in the United States, each respective Defendant is required to periodically monitor and ensure that the Accused Instrumentalities are performing as designed and intended, including but not limited to the enforcement of geographical restrictions of use.  Such testing and legal compliance necessarily requires each respective Defendant to make and use the respective Accused Instrumentalities in an infringing manner.  Still further, each respective Defendant is a direct infringer by virtue of its branding and marketing activities which collectively comprise the sale and offering for sale of the respective infringing Accused Instrumentalities.  *See* Figure Group A.

120.    The Accused Instrumentalities each comprise an apparatus including a computer, wherein the computer is specially programmed for processing information for providing for a placement of a bet on or regarding a sporting event.  As noted above, and on information and belief, the Accused Instrumentalities collectively comprise the branded Accused Mobile Wagering Platforms, each of which is comprised of hardware (including servers) and software (including source code).  Each such branded Accused Mobile Wagering Platform is directly accessible to users in the United States through the Accused Domains.  On information and belief, each individual Accused system comprises servers and/or computers with receivers, memory, processors, and transmitters, together with the interactive Internet domains and mobile applications of each respective Defendant which collectively operate as a single controlled apparatus to administer each branded Accused Mobile Wagering Platform in the United States.  The existence of each branded Accused Mobile Wagering

Platform necessarily requires the presence and use of a specially programmed computer or computer system, including Internet servers. As illustrated in Figure Group C, each such computer is specially programmed for offering, accepting, monitoring, and fulfilling wagers made by individuals on various events, including sporting events.

121.    The apparatus of the Accused Instrumentalities each includes a specially programmed processor, which detects postings of information regarding sporting events for which wagers can be placed via the Internet, and generates notification messages regarding such sporting events. More specifically, each such processor is specially programmed such that it detects the posting of sporting event schedules, wager availability, wagering odds, wager popularity, sporting event scoring and statistics, sporting event results, and wager status. Upon detection, each processor of each branded Accused Mobile Wagering Platform is specially programmed such that it transmits and delivers notification messages, which are reflected and take the form of updated, new, or revised data displayed via the Accused Domains. By way of example, each infringing processor is specially programmed such that it detects the posting of updated odds for specific wagers, and thereupon generates and delivers notification messages via the Accused Domains. On information and belief, such notifications are delivered to requestors when the computer of the infringing apparatus initiates a communication link with the browser via the Accused Domains, which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the corresponding Accused Mobile Application on the user mobile device). *See* Figure Groups A and C.

122.    The computer of each of the Accused Instrumentalities is specially configured to receive bet messages transmitted from the communication devices of users of the corresponding branded Accused Mobile Wagering Platform via the Accused Domains. Indeed, this is the primary purpose

and objective of the Accused Instrumentalities. More specifically, the user interfaces of the Accused Domains are specially programmed such that users can select from a menu of available sporting event wagers and transmit such wager selections ("bet messages") via the Internet to the servers and processors of the corresponding branded Accused Mobile Wagering Platform for fulfillment. *See* Figure Groups A and C.

123. On information and belief, each branded Accused Mobile Wagering Platform requires users to provide at least one global positioning device for each communication device. Such global positioning devices determine the physical location of such communication devices, and are essential and required by each respective Defendant for all users of the Accused Instrumentalities; each Defendant thus places each respective whole infringing apparatus into service and otherwise establishes the manner of performance of the claimed elements and/or conditions participation in the wagering opportunities upon the provision of such global positioning devices. *See* Figure Group B. More specifically, and on information and belief, in order to make beneficial use of each branded Accused Mobile Wagering Platform, users are required to accept and download, install, enable, and/or activate global positioning software on all devices from which wagers are able to be placed. Such software is required to be actively installed or enabled as part of the registration, log-in, or wagering process, or is otherwise embedded into the Accused Domains for seamless automatic installation and enablement. In addition, and/or in the alternative, each branded Accused Mobile Wagering Platform processes and assesses the respective global positioning devices of each communication device by identifying the specific network routing or IP address for each such communication device, or by processing functionally similar data.

124.  On information and belief, each branded Accused Mobile Wagering Platform is configured such that the global positioning data of the communication device is transmitted contemporaneous with the bet message, and is otherwise contained as part of the bet message.

125.  On information and belief, the computer/processor of each branded Accused Mobile Wagering Platform is configured such that it processes incoming bet messages for the purpose of allowing or disallowing the wagers associated therewith.  On information and belief, as part of the regulatory compliance protocols implemented by each respective Defendant, the decision to either allow or disallow a given wager is determined, at least in part, upon the information regarding the global position of the communication device from which the bet message originated.  *See* Figure Group B.

126.  On information and belief, each of the Accused Instrumentalities further comprise video recording and/or video conferencing devices which are configured to obtain and/or record live video information regarding the sporting events for which wagers can be placed.  The Accused Instrumentalities further each comprise transmitters, which are programmed so as to transmit such video information to users of the corresponding infringing system via the Accused Domains.  On information and belief, such video information is transmitted and delivered to users when the computer of the infringing apparatus initiates a communication link with the browser via the Accused Domains, which are received, assembled, and displayed on the communication device associated with the individual user (such as, for example, the corresponding Accused Mobile Application on the user mobile device) in the form of game highlights.  *See* Figure Groups A, C, and D (comprised of Figure Groups D.1 [Fanduel]; D.2 [FoxBet]; and D.3 [TVG/4NJBets]).



*See    https://sporttechie.com/fanduel-is-first-us-sportsbook-to-offer-automated-highlights-from-wsc-sports.*



*See   https://www.reuters.com/article/us-usa-gambling-sports/fanduel-first-to-stream-live-games-in-sports-betting-app-in-u-s-idUSKCN1S527S.*

**FIGURE GROUP D.1 [FANDUEL]**

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    62



*See https://www.foxsports.com/shows/fox-bet-live.*

**FIGURE GROUP D.2 [FOXBET]**



*See https://www.tvg.com/live.*



*See https://www.tvg.com/racetracks/GP/gulfstream-park?race=4.*

**FIGURE GROUP A.3 [TVG/4NJBETS]**

127.    The foregoing infringement on the part of each respective Defendant has caused past and ongoing injury to Plaintiff.  The specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the '920 Patent.

128.    To the extent each Defendant continues, and has continued, its infringing activities noted above in an infringing manner post-notice of the '920 Patent, such infringement is and will be necessarily willful and deliberate.

129.    Each of Defendants' aforesaid activities have been without authority and/or license from Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Beteiro, LLC respectfully requests the Court enter judgment against Defendant as follows:

1.    Declaring that Defendant has infringed each of the Asserted Patents;

2.    Awarding Beteiro, LLC its damages suffered because of Defendant's infringement of the Asserted Patents;

3.    Awarding Beteiro, LLC its costs, reasonable attorneys' fees, expenses, and interest;

4.    Granting a permanent injunction pursuant to 35 U.S.C. § 283, enjoining Defendants from further acts of infringement with respect to the Asserted Patents;

5.    Awarding Beteiro, LLC ongoing post-trial royalties for infringement of the non-expired Asserted Patents; and

6.    Granting Beteiro, LLC such further relief as the Court finds appropriate.

## JURY DEMAND

Beteiro, LLC demands trial by jury, under Fed. R. Civ. P. 38.

## **LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, Plaintiff states that, to its knowledge, the matter in controversy in this action is not the subject of any other action in any court, or any pending arbitration or administrative proceeding, except the following matters pending in the W.D. of Texas: *Beteiro, LLC v. PlayUp Ltd*; 6:21-cv-1150; *Beteiro, LLC v. Morris Mohawk*; 6:21-cv-1149; *Beteiro, LLC v. Kindred Group*; 6:21-cv-1148; *Beteiro, LLC v. Elys Game Tech*.; 6:21-cv-1147; *Beteiro, LLC v. Flutter Entertainment*; 6:21-cv-1162 and the following matters pending in the District of New Jersey:  *Beteiro, LLC v. DraftKings, Inc*.; 21-20148; *Beteiro, LLC v. PointsBet USA, Inc*., 21-20155; *Beteiro, LLC v. BetMGM, LLC; 21-20156; Beteiro, LLC v. Hard Rock Tristate AC LLC*; 21-20157; *Beteiro, LLC v. Hillside New Jersey, LLC*; 21-20158.

Dated:  February 4, 2022

Respectfully Submitted

*/s/ David A. Ward*
David A. Ward
   New Jersey Bar No. 042381996
   dward@klugerhealey.com
**KLUGER HEALEY, LLC**
521 Newman Springs Road, Suite 23
Lincroft, NJ  07738
Telephone:  (973) 307-0800
Facsimile: (888) 635-1653

M. Scott Fuller
   Texas Bar No. 24036607
   Georgia Bar No. 100968
   sfuller@ghiplaw.com
Randall Garteiser
   Texas Bar No. 24038912
   California Bar No. 239829
   rgarteiser@ghiplaw.com

**GARTEISER HONEA, PLLC**
119 W. Ferguson Street
Tyler, Texas 75702
Telephone: (903) 705-7420
Facsimile: (888) 908-4400
**ATTORNEYS FOR PLAINTIFF**
**BETEIRO, LLC**

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    65